CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
02/08/2018
JULIA C. DUDLEY, CLERK
BY: s/ F. COLEMAN
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| EUGENE L. REED,<br><br>                           *Plaintiff*,<br><br>v.<br><br>BEVERLY HILLS PORSCHE, *ET AL.*,<br><br>                          *Defendants*. | CASE NO. 6:17-cv-00059<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

This diversity case is before the Court on the question of personal jurisdiction over Defendant Beverly Hills Porsche (Beverly Hills).[1] Plaintiff Eugene Reed alleges claims of breach of contract, violation of Virginia's Consumer Protection Act, and fraud stemming from his purchase of a Porsche from Beverly Hills. Plaintiff initially contacted Beverly Hills through its website, kicking off remote negotiations by phone, email, and text message. Beverly Hills sent an agreement to Plaintiff in Virginia, which he signed. The contract calls for the application of California law, and Plaintiff's agent picked up the car directly from the dealership in California. Beverly Hills only rarely sells cars to Virginia residents, it has no physical presence in the Commonwealth, it does not advertise specifically there, and both its dealership agreement and website indicate that California is its primary area of responsibility. Based on these and other facts, personal jurisdiction is lacking, so the Beverly Hills' motion to dismiss will be granted.

---

[1] Defendant Porsche Cars North America, Inc. filed a response in which it implies personal jurisdiction does not exist over it. (Dkt. 14). But that defendant filed a general answer in state court before the case was removed (dkt. 5-2), thus waving any objection to personal jurisdiction. *Mobil Oil Co. de Venezuela v. Jimenez*, 948 F.2d 1282, at *2–3 (4th Cir. 1991) (unpublished); *McPhearson v. Anderson*, 874 F. Supp. 2d 573, 578 (E.D. Va. 2012). Beverly Hills is therefore the focus of this opinion.

## STANDARD OF REVIEW

The standard of review for personal jurisdiction issues "varies according to the posture of the case and the evidence that has been presented to the court." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). "When a district court considers a question of personal jurisdiction based on the contents of a complaint and supporting affidavits, the plaintiff has the burden of making a *prima facie* showing in support of its assertion of jurisdiction." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014); *see id*. at 560. In conducting its analysis, "the district court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id*. at 558. The parties presume that this standard governs here, but it does not.

A plaintiff has the ultimate burden to "establish facts supporting jurisdiction over the defendant by a preponderance of the evidence." *Grayson*, 816 F.3d at 268. When "the parties engaged in full discovery on the jurisdictional issue and fully presented the relevant evidence to the district court," the court uses the preponderance of the evidence standard. *Id*. at 265. This process requires an "evidentiary hearing," but the Fourth Circuit has explained that such a "hearing":

> requires only that the district court afford the parties a fair opportunity to present both the relevant jurisdictional evidence and their legal arguments. Once the court has provided that opportunity, it must hold the plaintiff to its burden of proving facts, by a preponderance of the evidence, that demonstrate the court's personal jurisdiction over the defendant.

*Id*. The district court has "broad discretion" to determine how to structure the hearing and may consider evidence through depositions, interrogatories, answers, admissions, exhibits, and other appropriate methods. *Id*. at 269. There is no "hard and fast rule" about the proceeding's

contours. *Id*. But once this process has run its course, the district sits as finder of fact unless there are disputes of fact overlapping with the substantive issues. *See id.* at 267.

In this case, the parties sought and received permission to engage in jurisdictional discovery, which lasted three months and included document productions, interrogatories, and depositions. They then filed supplemental briefs in which they presented their arguments and evidence to the Court. Lastly, the Court afforded the parties an opportunity to be heard at oral argument. Given this procedural history, the *Grayson* preponderance of the evidence standard applies. Moreover, neither party suggests that there are any material jurisdictional facts both in dispute and intertwined with the merits, so the Court itself sits as finder of the jurisdictional facts. The Court thus finds the following jurisdictional facts by a preponderance of the evidence.

## FINDINGS OF FACT

Plaintiff began searching for a car in the fall of 2016; he sought a used car with a certified pre-owned warranty. (Dkt. 15-1 ¶ 3). He had purchased Porsche vehicles previously, and from his experience was aware of the "Porsche Approved Certified Pre-Owned Vehicle warranty." (*Id*. ¶ 2). He accessed the website of Defendant Porsche Cars North America, Inc. (PCNA) and entered specifications for the kind of car he desired. (*Id*. ¶ 3). Over time, PCNA would then generate emails to Plaintiff informing him of Porsche dealerships possessing vehicles that met his specifications. (*Id*.). PCNA's emails invited Plaintiff to contact the relevant dealership(s) and provided contact information for them. (*Id*.). It was through this process Plaintiff learned of the car owned by Defendant Beverly Hills, a PCNA dealership. When Beverly Hills has a car, it uploads the car's specifications into PCNA's database, which then "populates" the information on both PCNA's and Beverly Hills' websites, both of which are designed by PCNA. (Dkt. 41 at 23–24).

Beverly Hills does not have offices, agents, or employees in Virginia, has never owned or leased property in Virginia, and does not advertise specifically within Virginia. (Dkt. 8-1 ¶ 4). Relatedly, the standard provisions of PCNA's dealership agreement provide that a dealership has a "Primary Area of Responsibility," *i.e.*, a geographical area determined solely by PCNA. (Dkt. 41 at 48–49; dkt. 42 at ECF 37). A dealership, though, "may" sell products outside of that area provided that (1) it satisfies other best-practice-type requirements and (2) "such sales are within the 50 United States." (Dkt. 42 at ECF 12).

Beverly Hills' primary area of responsibility is the greater Los Angeles area. (Dkt. 8-1 ¶ 6; dkt. 42-1 at 2). This affects, among other things, where Beverly Hills is permitted to advertise. For instance, the "2017 Porsche Dealer Marketing Covenant & PDMS Guidelines," which are issued by PCNA and applicable to Beverly Hills, provide that "[d]ealers are to place their marketing, irrespective of the message, only within their Primary Area of Responsibility." (Dkt. 43-1 at ECF 9). The Guidelines state that "[a]dvertising language promoting nationwide delivery . . . is not permitted." (*Id*. at ECF 8). Furthermore, the Guidelines apply to Internet advertising, "including [the observance of] rules of Geographic Market Areas and Primary Areas of Representation." (*Id*. at ECF 10–11).

Through one of PCNA's emails, Plaintiff learned that Beverly Hills had a car fitting his desired specifications. (Dkt. 15-1 ¶ 4). PCNA's email directed Plaintiff to contact Beverly Hills if he was interested in the car, which he did by filling out a form on the dealership's website. (Dkt. 8-1 ¶ 8; dkt. 41 at 39). Beverly Hills' website is www.beverlyhillsporsche.com. The website contains information about cars and can be used to initiate contact with Beverly Hills, but it cannot be used to transact business. (Dkt. 8-1 ¶ 7). On the whole, the website conveys an emphasis on serving the greater Los Angeles area. The bottom left-hand side of the webpage

states that Beverly Hills is a "local source" for Porsche products and is "centrally located" to Los Angeles. The parties have not directed the Court to any portion of the website that refers to Virginia or any other state besides California.

A mainstay tab in the upper right-hand corner has an "email" link, which then generates fields for entry. Plaintiff used this form, providing his name, email address, and phone number, and indicating he was "interested in further details" about the car in question. (8-1 ¶ 8.). Submission of the online form generated a notification to Beverly Hills, who then assigned a salesman to Plaintiff's inquiry. (dkt. 8-1 ¶ 8; dkt. 8-2 ¶ 2).

The salesman responded to Plaintiff email on May 1, 2017, thanking Plaintiff for his interest. (Dkt. 8-2 ¶¶ 2–3; dkt. 15-1 at ECF 8–9). The two men then began negotiating— exchanging phone calls, text messages, and approximately 20 emails—but they never met in person. (Dkt. 8-2 ¶ 3; dkt. 15-1 at ECF 8–19). Indeed, Plaintiff informed the salesman early in their negotiations that he could not visit the dealership because he lived in central Virginia.

On May 2, 2017, the salesman had Beverly Hills prepare the sales contract and overnight it to Plaintiff in Virginia. (Dkt 8-2 ¶ 4). Plaintiff signed the contract in Virginia and sent it back, at which point Beverly Hills signed it. (*Id*.). The contract states that "[f]ederal law and California law apply to this contract." (Dkt. 8-2 at ECF 7).

The salesman, at Plaintiff's request, provided Plaintiff with instructions on how to wire funds to Beverly Hills' bank. (Dkt. 8-2 ¶ 5). Despite being told that Beverly Hills could deliver across the country, (dkt. 15-1 ¶ 4), Plaintiff made independent arrangements with a local California towing company to transport the car; the company picked up the vehicle from Beverly Hills and delivered it to Plaintiff in Virginia. (*Id*. ¶ 6; dkt. 8-1 ¶ 9). After the salesman and Plaintiff had reached an understanding regarding the purchase, Plaintiff wrote to request a

"Beverly Hills Porsche lic[ense] plate frame" and "a mug or cup" because the car was "gonna b[e] a big deal in Forest[,] VA." (Dkt. 15-1 at ECF 18). When the car arrived in Virginia, it allegedly did not meet the promised specifications, so Plaintiff's wife contacted Beverley Hills and PCNA to demand a refund, to no avail. (Dkt. 15-1. ¶ 5; *id*. at ECF 19).

Although the "vast majority" of Beverly Hills' sales are to local California residents, when the opportunity arises the dealership is "not reluctant to sell a vehicle in California to someone who lives in Virginia." (Dkt. 42-1 at 4; dkt. 41 at 27, 36; *see id*. at 38–39). Between 2013 and 2017, Beverly Hills sold five cars to Virginia customers, with none in 2014 and 2016. (Dkt. 42-1. at 5). The total amount of these five sales was approximately $440,000, equating to roughly 0.1% of combined sales for the 2013, 2015, and 2017. (*Id*.). From January 2000 to July 2017, Beverly Hills sold over 22,000 cars, only nine of which (0.0402%) were sold to Virginia buyers. (Dkt. 8-1 ¶ 5). It has never leased cars to any Virginia resident. (*Id*.).

## ANALYSIS

The personal jurisdiction inquiry consists of, first, determining whether that state's long-arm statute reaches the defendant and, second, whether that reach is consistent with the Due Process Clause. *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 212 (4th Cir. 2002).

### I. Virginia's Long-Arm Statute

Plaintiff advances two grounds under the state long-arm statute that he claims support jurisdiction. (Dkt. 15 at ECF 2–4; dkt. 39 at 6–7). The first fails but the second succeeds.

#### A. Va. Code § 8.01-328.1(A)(2)

Subsection (A)(2) provides for long-arm jurisdiction over anyone who contracts "to supply services or things in this Commonwealth." This provision does not apply because the

thing supplied—the car—was supplied *in California*, not Virginia. *See Glumina Bank d.d. v. D.C. Diamond Corp.*, 259 Va. 312, 317 (Va. 2000) (finding subsection (A)(2) satisfied because foreign company contracted to transfer funds into a bank account in Virginia); *see also City of Lynchburg v. English Const. Co.*, 277 Va. 574, 584 (Va. 2009) (applying "last antecedent rule" of statutory interpretation); *Alger v. Virginia*, 267 Va. 255, 260 (Va. 2004) (same). Specifically, Plaintiff's agent picked up the car directly from Beverly Hills' site in California. At that point, delivery was complete. *Processing Research, Inc. v. Larson*, 686 F. Supp. 119, 122 (E.D. Va. 1988) (holding subsection (A)(2) inapplicable where purchased aircraft was delivered in Colorado).

Plaintiff says that subsection (A)(2) is satisfied because he consummated the contract in Virginia. But this argument improperly re-jiggers the statute's words. What matters is the place of supplying, California, not the place of contracting, Virginia. *See Glumia Bank*, 259 Va. at 317; *Processing Research*, 686 F. Supp. at 122.

Plaintiff points out that "it was known from the very beginning" that he was in Virginia, and that therefore the car would be used in the Commonwealth, even though Plaintiff arranged to pick it up in California. (Dkt. 15 at ECF 3–4). That all may be true, but it is legally irrelevant under the terms of subsection (A)(2). At the very least, Plaintiff has not cited any case showing that mere knowledge that one's goods will eventually end up in Virginia amounts to contracting to supply them in Virginia. (*See* dkt. 15 at ECF 3–4; dkt. 39 at 6).

**B.     Va. Code § 8.01-328.1(A)(5)**

Subsection (A)(5) provides for jurisdiction over a defendant who satisfies three conditions: (i) there is a breach of warranty made in the sale of goods outside Virginia; (ii) the seller "might reasonably have expected" the buyer to use the goods in Virginia; and (iii) the

seller, among other things, "derives substantial revenue from goods" consumed or rendered in Virginia.

The second and third conditions are satisfied. Beverly Hills could and should have reasonably expected the car to be used in Virginia, given that it knew it was negotiating with a Virginian, sent the contract to Virginia for him to sign, and knew Plaintiff was hiring a towing company to pick up the car and transport it cross-county to him in Virginia. (Maculy def at 38-39).

Additionally, Beverly Hills has derived "substantial revenue" from its sales in Virginia over the years. *Ajax Realty Corp. v. J. F. Zook, Inc.*, 493 F.2d 818, 821–22 (4th Cir. 1972) (holding $37,000 was "substantial revenue" even though it represented "only one-half of one percent" of company's total sales); *Korean Video Broad. Corp. v. D & H Visual Art, Inc.*, 67 F.3d 295, at *2 (4th Cir. 1995) (sale of videotapes amounted to "substantial revenue"); *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1571 (Fed. Cir. 1994) (citing *Ajax* with approval when applying Virginia law).

This leaves the "warranty" requirement, which presents a more difficult question. For starters, the complaint contains no claim labeled "breach of warranty." Instead, the three counts are denominated as "Breach of Contract," "Consumer Protection Act," and "Fraud." (Complaint ¶¶ 6–14). The complaint earlier alleges, however, that "[t]he contract" required Beverly Hills to furnish the car "with the 'Porsche Approved Certified Pre-Owned Vehicle' Warranty," which provided "[c]omprehensive mechanical cosmetic inspection completed prior to certification" and a "110-point check list." (Complaint ¶ 2). Plaintiff alleges that, once received in Virginia, the car "did not conform to the 110-point checklist as required by the Porsche Certified Pre-Owned Warranty." (*Id.*). Beverly Hills' position is that the complaint "does not allege breach of

warranty" but of contract, and thus subsection (A)(5) "on its face is inapplicable." (Dkt. 18 at ECF 6; *see* dkt. 43 at 2, 15 ("Plaintiff has not even alleged a cause of action for breach of warranty.")).

The issue is whether—for purposes of the long-arm statute—the breach of contract claim in Count 1 can be characterized as a "breach of warranty expressly or impliedly made." Virginia's long-arm statute does not define a "warranty," and there is a paucity of Virginia law on the precise difference between a breach of contract and breach of warranty.[2] A few Virginia trial courts observe in passing that breach of warranty and breach of contract are separate claims. *Newman v. Freeman Homes, Inc.*, 89 Va. Cir. 377, at *2 n.4 (Norfolk Cir. Ct. 2014) ("Breach of warranty and breach of contract are usually considered separate rights of action."); *United Leasing Corp. v. MDA Lending Sols., Inc.*, 82 Va. Cir. 230, at *5 (Cir. Ct. Hanover Cnty. 2011) ("[B]reach of warranty claim and breach of contract claim are entirely separate. A breach of warranty claim evaluates the product itself, while the breach of contract claim focuses on the performance of the contractual obligations"). The Court, however, finds the Supreme Court of Virginia's decision in *Waterfront Marine Construction, Inc. v. N. End 49ers Sandbridge Bulkhead Groups A, B & C*, to be more apt and authoritative.

*Waterfront* considered whether *res judicata* barred a second demand for arbitration over breach of a contractual warranty. 251 Va. 417, 430, 433. The first demand had been framed as a breach of contract. The Court applied *res judicata* because the breach of warranty claim in the second arbitration demand "was no different than the claim for breach contract" in the first

---

[2] Black's Law Dictionary (10th ed. 2014 (Westlaw)) defines a contractual warranty as an "express or implied promise that something in furtherance of the contract is guaranteed by one of the contracting parties."

– 9 –

demand. *Id*. at 435. "Labeling the claim a breach of warranty rather than a breach of contract does not alter the nature of the claim. That label is a distinction without a difference." *Id*.

In other words, the Supreme Court of Virginia has employed a functional approach to the relationship between breach of warranty and contract, and when the substance of the two is the same, the difference in nomenclature is immaterial. That is the situation here. While labeled "Breach of Contract," the substantive allegations in the complaint (as well as the details of Plaintiff affidavit) contemplate a warranty, specifically failure to comply with the "'Porsche Approved Certified Pre-Owned Vehicle' Warranty" and "110-point checklist." Moreover, the contract seemingly envisions the incorporation of at least some warranties. Although it disclaims all warranties not in writing, it observes that if, as was the case here, "the Seller has sold you a certified used vehicle, the warranty of merchantability is not disclaimed." (Dkt. 8-2 at ECF 7, § 4).

Although the question is a close one, the Court believes that Plaintiff's claim, based on both how it is pled and the facts presented in Plaintiff's affidavit, is sufficient to fall within the term "warranty" in subsection (A)(5). With the state long-arm statute satisfied, the Court thus turns to the constitutional limits on jurisdiction.

## II. Due Process Clause Requirements

Personal jurisdiction under the Due Process Clause can be either general or specific. For general jurisdiction, "the defendant's activities in the State must have been continuous and systematic." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002). The Supreme Court has reiterated that these activities must render the out-of-state corporation "essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 754, 758 n.11

(2014). That is not the case here, and neither party argues that it is so: Beverly Hills overwhelmingly operates in California and has only fleeting connections to Virginia.

Specific jurisdiction, on the other hand, "is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (U.S. 2011). The "defendant must have purposefully established minimum contacts in the forum State such that [it] should reasonably anticipate being haled into court there," and "a court must weigh the totality of the facts before it." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016). The defendant's contacts "must have been so substantial that they amount to a surrogate for presence and thus render the exercise of sovereignty just." *Consulting Engineers*, 561 F.3d at 277–78.

The Fourth Circuit employs "a three-part test to determine whether the exercise of specific personal jurisdiction over a nonresident defendant comports with the requirements of due process . . . . (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims [arose] out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 559 (4th Cir. 2014). The first prong, purposeful availment, is the central issue here.

### A.     **Purposeful Availment**

#### 1.     <u>**The 8-factor test**</u>

In working through the purposeful availment prong, Beverly Hills cites the 8-factor test set out by the Fourth Circuit. (Dkt. 8 at 8–11). These nonexclusive factors are: (1) whether Beverly Hills has offices or agents in Virginia; (2) whether Beverly Hills owns property in Virginia; (3) whether Beverly Hills reached into Virginia to solicit or initiate business; (4)

whether Beverly Hills deliberately engaged in significant or long-term business activities in Virginia; (5) whether the parties agreed that Virginia law would apply; (6) whether Beverly Hills made in-person contact in Virginia; (7) the nature, quality, and extent of communications about the business transaction; (8) whether performance of the contract was to be in Virginia. *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016); *Consulting Engineers*, 561 F.3d at 278.

(1). <u>Officers or agents</u>. Beverly Hills has never had offices or agents in Virginia, (dkt. 8-1 ¶ 4), so this factor favors it.

(2). <u>Property</u>. Likewise, Beverly Hills neither owns nor leases property in Virginia. (Dkt. 8-1 ¶ 4).

(3). <u>Initiation of dealings</u>. The Court finds that Plaintiff initiated the business dealings with Beverly Hills by messaging it through its website. (Dkt. 8-2 ¶ 2; dkt. 15-1 ¶ 4). He contacted Beverly Hills specifically because it had the type of car he wanted. The record also supports the inference that he reached out to Beverly Hills for its brand recognition. (Dkt. 15-1 ¶¶ 3–4 & ECF 18).[3]

Plaintiff argues that Beverly Hills actually initiated the dealings by reaching out, *through its association with PCNA*, into Virginia to solicit business. Specifically, Beverly Hills uploaded information about the car into PCNA's database, and PCNA then generated the email to Plaintiff directing him to contact the dealership directly if he was interested in its inventory. But this

---

[3] Of course, one could say Beverly Hills "reached into" Virginia by having a website, but by that logic it has reached into essentially every jurisdiction in the world, a conclusion courts have rejected. *ALS Scan*, 293 F.3d at 712 ("If we were to conclude . . . that . . . placing information on the Internet subjects that person to personal jurisdiction [wherever it is viewed,] then the defense of personal jurisdiction . . . would no longer exist."). Moreover, Beverly Hills' website has a local focus, making clear the dealership serves the greater Los Angeles area, is a "local source" for Porsche products, and is "centrally located" to Los Angeles.

argument is too thin. The fact of the matter is that all Beverly Hills did was supply its inventory data to PCNA. What PCNA did with that information was its business. (*See* dkt. 41 at 32–33). Moreover, PCNA and Beverly Hills have a basic franchisor-franchisee relationship, in which PCNA, to some extent, controls the actions of Beverly Hills, not the other way around. (Dkt. 42 at at ECF 9–12, 17–18). All in all, the initiation of the business transaction between Beverly Hills and Plaintiff occurred when Plaintiff emailed Beverly Hills specifically about the car, not when PCNA emailed Plaintiff merely mentioning it.

In sum, this factor favors Beverly Hills.

(4). <u>Significant/long-term activities</u>. Beverly Hills' historical business activity in Virginia is modest, and Plaintiff has put forward no evidence suggesting Beverly Hills has ongoing business concerns in the Commonwealth. In the 17 years prior to this lawsuit, Beverly Hills sold only 9 cars (or 0.04% of its total sales) to Virginia buyers and has never leased a car to a Virginian. (Dkt. 8-1 ¶ 5). Five of those sales occurred between 2013 and 2017. (Dkt. 42-1 at 5). Beverly Hills also furnished evidence that it sent 9 emails over the five-year period to potential customers in Virginia who did not purchase cars. (Dkt. 52-1 at 5).

Beverly Hills is willing to sell to Virginia customers, but its primary area of responsibility as assigned by PCNA is greater Los Angeles. (Dkt. 41 at 48–49; dkt. 42 at ECF 12, 37; dkt. 42-1 at 2, 4). According to its Director of Operations, the "vast majority" of Beverly Hills' sales are to California residents. (Dkt. 41 at 27, 36). And as observed above, its website emphasizes its local focus. Further, according to advertising guidelines from PCNA, Beverly Hills may not advertise that it will deliver cars nationwide, and the various advertising restrictions imposed—including geographic restrictions—apply to Beverly Hills' online advertising. (Dkt. 43-1 at ECF 8, 10–11).

All told, Beverly Hills' business activities in Virginia are sporadic and largely incidental. Nonetheless, Beverly Hills is willing to entertain business when an opportunity arises, which is roughly once or twice a year on average over the last 17 years. And each sale can generate a steep price, up to six figures. Overall, this factor provides support to Plaintiff.

(5). <u>Choice of law</u>. The parties' contract provided that California law applies and makes other specific references to California law. Accordingly, this factor cuts against Plaintiff and for Beverly Hills.

(6). <u>In-person contact</u>. No one from Beverly Hills came to Virginia or otherwise visited Plaintiff in-person.

(7). <u>Nature, quality, and extent of communications</u>. The extent of communications here was modest. Plaintiff and a Beverly Hills employee conducted negotiations by email, text message, and phone over a multi-day period. (Dkt. 8-2 ¶¶ 3–4; dkt. 15-1 ¶¶ 4–5). The quality of electronic communications was brisk: The 19 emails from May 1 through May 6 between Plaintiff and Beverly Hills were mainly three or four staccato sentences or sentence-fragments, essentially the bare-minimum needed to convey the requisite information. The Court does not have before it testimony detailing the quality of phone conversations between the parties.

Overall, this factor favors Plaintiff, albeit only slightly so.

(8). <u>Location of contractual performance</u>. The parties agreed that Plaintiff was responsible for picking up the car from Beverly Hills, which Plaintiff effectuated by hiring a California towing company. Accordingly, the place of performance—*i.e.*, transfer to Plaintiff (or his agent) of the purchased item—was California.

\*   \*   \*

To summarize, six of the eight factors (1, 2, 3, 5, 6, and 8) strongly cut against finding

personal jurisdiction. Only two factors (4 and 7) support finding it, and they do not weigh overwhelmingly in Plaintiff's favor.

### 2. *Consulting Engineers Corp. v. Geometric Ltd.* (4th Cir. 2009).

*Consulting Engineers Corp. v. Geometric Ltd.* provides additional and analogous support for not finding personal jurisdiction. There, a Virginia company filed a tort and contract suit in Virginia after entering into nondisclosure agreements with corporations from India and Colorado. 561 F.3d at 276. The Virginia-India agreement was governed by Virginia law, with each party negotiating from its home location via email and telephone. It was signed in India. The Virginia-Colorado agreement was governed by Colorado law, had a Colorado forum selection clause, and was negotiated from each parties' home location through 24 emails and several phone calls.

In finding no jurisdiction over the Colorado company, the Fourth Circuit pointed to facts similar to those here: the out-of-state defendant had no offices, employees, or property in Virginia; it had no ongoing business commitments in Virginia; it negotiated the agreement from outside Virginia and signed it outside Virginia; and the contract had a non-Virginia choice of law provision. 561 F.3d at 280–81. Moreover, the fact that the Colorado company—unlike Beverly Hills—"reached out" to the Virginia plaintiff did not overcome the other factors. *Id*. at 281.[4] The Court also noted that "the mere fact that emails, telephone calls, and faxes were employed" by the parties did not change its analysis. *Id*. at 279 n.5.

Jurisdiction was also lacking over the Indian company. Akin to Beverly Hills in this case, the Indian company was based in, and "negotiated solely from," another jurisdiction; it owned no Virginia property; its employees didn't work in or travel to Virginia; it did not

---

[4] This facet of *Consulting Engineers* demonstrates that, even if—as Plaintiff contends—Beverly Hills reached out to Virginia through PCNA, personal jurisdiction would still be absent.

"initiate[]" contact with the Virginia plaintiff; it had no in-person meeting with plaintiff; it lacked "on-going business activities in Virginia"; the place of performance was outside Virginia; and communications were limited to a few "brief" emails, several phone calls, and an exchange of draft documents. *Id*. at 281–82. And even a Virginia choice of law provision (which is absent here) in the Virginia-Indian agreement could not overcome the other factors. *Id*.

In other words, Beverly Hills is situated very similarly to (and perhaps even more favorably than) the defendants in *Consulting Engineers*, over whom personal jurisdiction was absent.

Beverly Hills is also situated *dissimilarly* from defendants who have been subject to personal jurisdiction. For instance, personal jurisdiction did not exist where the "defendant contacted the plaintiff in the forum state, conducted repeated in-person solicitations and meetings concerning the parties' business relationship there, and engaged in numerous business transactions over a two-year period." *Universal Leather*, 773 F.3d at 556. There were "vigorous business solicitations" that "gave rise to a two-year relationship between the parties that spanned a series of transactions and resulted in the sale of millions of dollars in goods." *Id*. at 561.

Elsewhere, Virginia had personal jurisdiction over a defendant who "had an office and employee in the forum state, its representatives traveled to the forum state, and a critical part of the activity of which the plaintiffs complain—conspiring to infringe its intellectual property rights—took place in the forum state." *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 304 (4th Cir. 2012); *see CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 293–94 (4th Cir. 2009) (finding personal jurisdiction where "defendants met with the plaintiffs in Virginia to discuss the possibility of entering into a business relationship; the defendants retained the plaintiff; some disputes between the parties were settled

over the telephone . . . ; the defendants travelled to Virginia at least once to meet with the plaintiff to discuss disputed fees; and the defendants sent correspondence and mailed payments to the plaintiff in Virginia").

Simply put, the Fourth Circuit cases in which business relationships gave rise to personal jurisdiction involve significantly greater contacts with the forum state than those present here.

**B.** *ALS Scan, Inc. v. Digital Service Consultants, Inc.* **(4th Cir. 2002)**

Lastly, the parties debate the application of the Fourth Circuit's decision in *ALS Scan*. That case stated that personal jurisdiction exists over a foreign entity or person when it "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002). The parties then set about arguing how interactive Beverly Hills' website is and whether it suffices to create jurisdiction.[5]

The Court is not persuaded that *ALS Scan* holds much sway in this instance. Viewed in isolation, *ALS Scan*'s reference to "electronic activity" could be read to trigger its test whenever a fact-pattern in some respect implicates a website or email. But just because a case in some respect involves a website does not automatically place it within the scope of *ALS Scan*. As the Fourth Circuit later observed, "the mere fact that emails, telephone calls, and faxes were employed does not, of itself, alter the minimum contacts analysis" or implicate "the issue of the role of technology in personal jurisdiction." *Consulting Engineers*, 561 F.3d at 279 n.5.

That conclusion also seems apt given that the claims here are not derivative of or dependent upon Beverly Hills' website. This is not, for instance, a false advertising or trademark

---

[5] *ALS Scan* adopted a three-tiered scheme for classifying websites: passive, semi-interactive, and active.

infringement case based on the website's content. Rather, the claims are grounded in Beverly Hills' later conduct during negotiations and its substantive performance of the contract. *See ALS Scan*, 293 F.3d at 714 (observing that defendant's direct contact with forum was "the general publication of its website on the Internet," but "that website is unrelated to" plaintiff's claim because the website did involve the allegedly infringing photographs). Subsequent Fourth Circuit cases applying *ALS Scan* have reserved it for instances where the sued-over conduct was part and parcel of the Internet activity itself. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 393 (4th Cir. 2003) ("[W]e address whether . . . operating an Internet website that allegedly infringed [Marylander's] trademark rights" creates personal jurisdiction in Maryland); *Young v. New Haven Advocate*, 315 F.3d 256, 258 (4th Cir. 2002) (finding no jurisdiction over defamation claim based on newspaper article posted to website).

Even if the *ALS Scan* framework applied, it would not establish jurisdiction based on the semi-interactive website here. *ALS Scan* emphasized that, "in the Internet context," there must be proof "that the out-of-state defendant's Internet activity is *expressly targeted at or directed to the forum state*." *Young*, 315 F.3d at 262–63 (citing *ALS Scan*, 293 F.3d at 714) (emphasis added). So for instance, the Fourth Circuit in *Young* asked:

> whether the newspapers manifested an intent to direct their website content—which included [allegedly defamatory] articles discussing conditions in a Virginia prison—to a Virginia audience. As we recognized in *ALS Scan,* a person's act of placing information on the Internet is not sufficient by itself to subject that person to personal jurisdiction in each State in which the information is accessed. . . . Thus, the fact that the newspapers' websites could be accessed anywhere, including Virginia, does not by itself demonstrate that the newspapers were *intentionally directing their website content to a Virginia audience*. Something more than posting and accessibility is needed . . . . The newspapers must, through the Internet postings, manifest an intent *to target and focus on Virginia readers*.

*Young*, 315 F.3d at 263 (emphasis added) (internal citations and quotations omitted). Nothing about Beverly Hills' website evinces such targeting. As explained in the findings of fact, *supra*,

– 18 –

the website instead touts Beverly Hills' connection to the "local" Los Angeles area, which comports with its designated Primary Area of Responsibility and the advertising guidelines imposed by PCNA. This "decidedly" and "strongly local character" of the website thus cuts against finding personal jurisdiction. *Young*, 315 F.3d at 263; *Carefirst*, 334 F.3d at 401.

\* \* \*

Having found that the purposeful availment aspect of specific jurisdiction is lacking, the Court need not address the latter two prongs. Exercising jurisdiction in Virginia over Beverly Hills in this case would offend the Due Process Clause. Accordingly, Beverly Hills' motion to dismiss will be granted, and it will be dismissed from this action without prejudice. An appropriate order will issue. The Clerk is directed to send a copy of this opinion and the accompanying order to counsel of record.

Entered this __8th__ day of February, 2018.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE